# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs July 21, 2010

## STATE OF TENNESSEE v. RANDY CLAYTON NORMAN

**Direct Appeal from the Circuit Court for Maury County**
**No. 16988     Jim T. Hamilton, Judge**

**No. M2009-01246-CCA-R3-CD - Filed September 2, 2010**

The defendant, Randy Clayton Norman, was convicted by a Maury County Circuit Court jury of second degree murder, a Class A felony, and sentenced to twenty years in the Department of Correction. On appeal, he argues that: (1) he received the ineffective assistance of counsel; (2) the trial court did not perform its duty as the thirteenth juror; (3) the evidence is insufficient to sustain his conviction; and (4) the trial court erred in sentencing him. After review, we affirm the defendant's conviction but modify the defendant's sentence to fifteen years.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed as Modified**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Hershell D. Koger, Pulaski, Tennessee (on appeal); Wesley Mack Bryant, Columbia, Tennessee (at trial), for the appellant, Randy Clayton Norman.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; T. Michel Bottoms, District Attorney General; and Lawrence R. Nickell, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case arises out of the defendant's killing his daughter's boyfriend, Timothy Michael Fuller, with an axe, for which he was indicted on one count of first degree premeditated murder.

## State's Proof

At trial, April Norman, the defendant's daughter and victim's girlfriend, testified that she and the victim had two children, ages one and three. Norman testified that around 5:30 or 6:00 p.m. on January 10, 2007, she and the victim went to the defendant's house trailer to have dinner with the defendant and her mother, Gwendolyn Westmoreland. She recalled that her children were with them at the defendant's house, and all of the adults were drinking and taking Lortab pills.

Norman testified that initially everyone was getting along with one another, but then she and Westmoreland got into a physical fight. She explained that it was not unusual for the two of them to fight. The fight took place in the defendant's bedroom, which was a combination living room and bedroom. Norman recalled that they were on the floor fighting, and the defendant called for the victim to come into the room and break up the fight. Meanwhile, Westmoreland kicked Norman off of her by kicking her in the nose. When the victim came into the room, "he told [Norman] to look up" to see if her nose was bleeding. Norman recalled that right after the victim told her to look up, "[h]e went down." Norman said that she did not know what kind of shape the victim was in when "[h]e hit the floor," but he would not speak or open his eyes and she was covered in his blood. Norman remembered seeing the defendant "just standing there" with an axe in his hand. She ran out of the house to Scott's Market, a nearby store, to call 911.

Norman testified that the victim was not yelling when he entered the bedroom, and he did not hurt her. Asked if she saw him hurt Westmoreland, Norman responded, "I guess he had got over her, she said. I didn't see it." She said that she did not know of the victim hitting Westmoreland or having a knife. Norman stated that Westmoreland told her later that night that the victim had "grabbed her and screamed in her face," but she did not see that happen. Norman recalled that she had seen the defendant and the victim argue "several times" in the past and fight physically.

On cross-examination, Norman elaborated that the four adults were drinking a twelve-pack of beer and a pint, or possibly two, of vodka, and taking Lortab pills. She also elaborated that Westmoreland was sitting on the ground during their fight and they were pulling each other's hair. Norman assumed that Westmoreland was still on the ground after she kicked her, but Norman's hands were over her face and she could not see. Norman said that she did not remember seeing the victim enter the bedroom or remember seeing the defendant do anything when she had her hands over her face. She also did not see what the victim may have done before he told her to look up at him.

On redirect examination, Norman testified that she believed her children were in the

bed in the room while the events were going on. On recross examination, Norman testified that the victim was in the room with them until she and Westmoreland started arguing, at which point he walked out and she did not see him again until he told her to take her hands away from her face.

Gwendolyn Westmoreland testified that she had been married to the defendant for twenty-seven years, but they had been divorced for eight years. She was currently married to Tommy Westmoreland. Westmoreland recalled that the evening of January 10, 2007, she was at the defendant's residence where she was staying temporarily, and Norman, the victim, and their two children came over for dinner. While they were waiting for dinner to get ready, the four adults were drinking and taking Lortab pills.

Westmoreland testified that after dinner, Norman started "cursing [her]," and Westmoreland went into the defendant's bedroom and sat on the floor in front of the heater. Norman said that "she was going to whip [Westmoreland's] ass," and Westmoreland said, "[W]ell, that's what you need to do, I guess." The women started pulling each other's hair, as they had done on previous occasions. Neither woman would let the other go, so Westmoreland kicked Norman and "she landed . . . rather far[.]" After Westmoreland kicked Norman, the defendant called for the victim to come in the room.

Westmoreland testified that the victim "screamed at [her] . . . [s]omething about it being all [her] fault" when he entered the bedroom, but she did not see any weapon in his possession. Westmoreland said that the victim did not hurt her in any way, and she "[did not] recall him putting his hands on [her]." She said that "[h]e screamed at [her] and that was it." She stated that the victim did not threaten her, and she was not afraid of him. Westmoreland recalled that the victim "went over and bent over [Norman], and was -- Because, she says, I kicked her in the face. I thought I had kicked her in the chest." The next thing Westmoreland saw was the victim lying in a pool of blood and the defendant standing over him holding an axe.

Westmoreland testified that she did not remember hearing the defendant say anything prior to seeing the victim on the floor, and she did not remember the defendant hitting the victim either. She recalled that after she saw the victim on the floor, she screamed and grabbed the axe from the defendant's hand and threw it outside on the porch. She remembered telling the defendant, "[W]hat do you think you've done? You probably just killed him." Westmoreland stated that she had fought with Norman before and that "[q]uite a few" of their fights had taken place in the defendant's presence. She said that when the police arrived, she was separated from Norman and placed in one of the patrol cars.

On cross-examination, Westmoreland elaborated that the victim was initially in the defendant's bedroom with everyone else, but he left when she and Norman started arguing. However, she admitted that she was not aware of who was in the room while the fight was going on. Westmoreland stated that once she kicked Norman off of her, she saw the defendant standing in the doorway and the victim was already in the room.

Westmoreland testified that the victim approached her and stood crouched down over her as he screamed at her. She admitted that the victim was accusing her of starting the fight. Westmoreland denied that the victim grabbed her or telling Norman later that the victim had grabbed her. As the victim screamed at her, Westmoreland looked over at Norman and the victim went to check on her.

Westmoreland admitted that she gave a statement to police the night after the incident in which she said that she heard the defendant tell the victim, "[C]ome and get [Norman] off [Westmoreland]" while the fight was going on. She admitted that she also said in her statement, "[The victim] came, trying to get us apart, and the next thing I know he was on the floor[.]" However, she testified that she did not know why she said that because she and Norman were already apart when the victim came in the room. Westmoreland admitted that she did not know whether the victim made any gestures with his hands or reached back toward his pocket. She acknowledged that she also did not mention in her statement that the victim had gone toward Norman to check on her. On recross-examination, Westmoreland admitted that at the time of the incident, the defendant had a genuine affection for her and would "[p]robably not" wish her any harm.

Cynthia Woodard, an employee of Scott's Market, testified that she was working the 10:00 p.m. to 6:00 a.m. shift on January 10, 2007, during which a "girl ran in with blood all over her, just tore all to pieces, saying her dad had just chopped her husband with an axe, and he was bleeding to death." Woodard called 911. The store's surveillance video was played for the jury.

Officer Carl Shrake with the Columbia Police Department testified that he was assigned to the Evidence Collection Unit and in such capacity responded to the scene in this case. Officer Shrake photographed the crime scene and collected physical evidence, including the axe, a coat, and a pocketknife. He also swabbed the pools of blood on the floor. Officer Shrake stated that he found the axe on the deck of the trailer and the pocketknife and coat on the floor in the bedroom. He said that the knife was closed when he found it. He was told that the coat belonged to the victim. Officer Shrake identified the victim's belongings that were collected from the medical examiner's office – "white and black shorts, two white socks, and blue jean pants, and a pair of tennis shoes."

Dr. Feag Li, an assistant medical examiner for Davidson County and other counties in Middle Tennessee, testified that he performed an autopsy on the victim and found "a major defect of the left side of the temple as a result of a sharp force injury." Dr. Li noted that the victim suffered skull fractures, cerebral hemorrhage, vertical contusions, and injuries to the brain associated with the sharp force injury. On cross-examination, Dr. Li stated that a toxicology screen reported the presence of alcohol and a metabolite of cocaine.

Detective Andre Martin with the Columbia Police Department testified that he arrived on the scene at 12:25 a.m. on January 11. When he first encountered April Norman, she was in her house trailer across the street from the defendant's house. Gwendolyn Westmoreland was inside one of the patrol cars. Detective Martin stated that he swabbed the defendant's mouth to collect a DNA sample on January 18, 2007, and took prints of the defendant's palms on April 13, 2007. Detective Martin explained that he took the defendant's palm prints because he was informed by the Tennessee Bureau of Investigation ("TBI") that there was a palm print on the knife found at the scene that had been under the victim's body. He also collected the clothes and shoes the defendant was wearing on the night of the incident.

Detective Martin identified the victim's clothes that he retrieved from the medical examiner's office. Detective Martin stated that he delivered the physical evidence and the DNA swabs to the TBI Crime Laboratory. During Detective Martin's testimony, the parties stipulated that a pocketknife was taken from the victim's pocket at the hospital and entered it into evidence.

Detective Martin testified that he interviewed the defendant at 2:50 a.m. following the incident. Although the defendant had been drinking, Detective Martin determined that he answered questions appropriately and competently and had no problem understanding. Detective Martin advised the defendant of his rights, and the defendant proceeded to give a statement. Because the defendant did not have his eyeglasses and "didn't write that well," he told Detective Martin to write the statement for him. Detective Martin said that "as [he] took the statement, as [he] asked each question, [he] gave it back to [the defendant] verbatim: This is what you're saying? And [the defendant] always answered in the affirmative."

In his statement, the defendant referred to his daughter as April Fuller and the victim as his son-in-law and said they lived across the street from him. He said that they were both crack addicts and had been ordered by the police to not be at his trailer. The defendant stated that April and the victim often got into arguments. Also, a week prior to the incident, the victim "tried to jump on" Westmoreland, and the defendant told him to "back off." On the day of the incident, Westmoreland was babysitting his youngest grandchild, and around

6:30 p.m., April,[1] the victim, and the defendant's other grandchild came over for dinner.

The defendant said that he drank two beers that he had purchased from the store, and April and the victim were drinking a twelve-pack of beer and a pint of vodka. He did not know if Westmoreland drank anything. He stated that he took a drink of vodka and went to the bathroom. When he returned, Westmoreland was on the floor, and the victim was on top of her, "hitting her with his fist." The defendant said that he told the victim not to hit Westmoreland anymore, then grabbed the axe he used to cut wood and swung it at the victim. He said that the victim had his back to him when he hit him. The defendant said that he tried to get the victim up after he hit him and did not remember anything else thereafter. The defendant stated that he liked the victim, but he saw that Westmoreland's nose was bleeding and that she had a black eye, and he did not know why the victim was hitting her.

On cross-examination, Detective Martin acknowledged that Westmoreland never told him that the victim had gone away from her and toward Norman. Specifically, his notes from his interview with Westmoreland revealed that Westmoreland said that after she kicked Norman off of her, the victim "came on top of her . . . and said, you started this shit . . . [a]nd . . . the next thing she knows, he's on the ground." Detective Martin admitted that the defendant did not read the final statement for himself because he did not have his eyeglasses, but he explained that he read the final statement back to the defendant in the presence of Officer Archibald.

Detective Martin acknowledged that the victim was not the defendant's son-in-law and April Norman's last name was not Fuller even though that was written in the defendant's statement. Detective Martin maintained, however, that those were the defendant's words, and he wrote down what the defendant said verbatim. Detective Martin acknowledged that the defendant told him in his interview that the victim was hurting Westmoreland but said that the defendant never said that the victim was going to kill Westmoreland.

The parties stipulated that

if [they] put in the video of Officer Archibald, it would have a recording of Sergeant Erick talking to Detective Martin that evening, and advising . . . [t]hat he talked to [the defendant], [and] asked him about any knives. That [the defendant] had one that was brown and gold tip, doesn't know where it was. And that, Officer Sergeant Erick advised [Detective] Martin, the object

---

[1] We will temporarily refer to April Norman only as April given the discrepancy in her given name and how she was referenced in the defendant's statement.

found under the deceased must be [the defendant's].

Officer Chris Bishop, formerly with the Columbia Police Department, testified that he delivered evidence, the defendant's palm print card, to the TBI crime lab.

Officer Paul McCormick with the Columbia Police Department testified that he retrieved a package containing a fingerprint card and two palm prints from the TBI.

Officer Robert Archibald with the Columbia Police Department testified that he and three other officers arrived at the scene and encountered Westmoreland "standing in the roadway . . . screaming, hysterically." As they approached the residence, Officer Archibald saw the defendant sitting in a chair on the front porch, and Officer Seagroves took the defendant into custody. Inside, Officer Archibald found two children in a bed and the victim lying on the floor. Officer Archibald returned outside where he saw Norman, who had blood on her hands and blue jeans, with Westmoreland. Officer Archibald spoke with the women, trying to calm them down. He then assisted with placing the defendant in the backseat of his patrol car, during which he noticed that the defendant had blood on his hand and "quite a bit of blood . . . dripping off . . . the sole of his boots."

Officer Archibald testified that after securing the defendant in his patrol car, he walked back toward the residence and noticed the axe sitting on the front porch. Later, Officer Archibald transported the defendant to the Detectives Division, where he turned him over to Detective Martin. Officer Archibald witnessed Detective Martin give the defendant his Miranda rights and read over his statement to him. On cross-examination, Officer Archibald acknowledged that he was not present throughout the entire conversation between the defendant and Detective Martin. He also acknowledged that he did not look over Detective Martin's shoulder to see what was actually written when Detective Martin was re-reading the defendant's statement.

Officer Jeff Seagroves with the Columbia Police Department testified that he responded to Scott's Market where he was advised by Officer Marvin that the victim was at a nearby trailer park. Officer Marvin was attending to a "female . . . [who] was covered in blood and hysterical," so Officer Seagroves proceeded to the scene. At the scene, Officer Seagroves encountered a female, pointing him to the porch of the residence where the defendant sat. One of the other officers handcuffed the defendant and placed him in the back of a patrol car, while Officer Seagroves and Officer Walker started to clear the residence.

Officer Seagroves testified that he found the victim lying face down on the floor in one of the bedrooms. In that same room, Officer Seagroves found "two, small infants"

asleep in the bed. Emergency medical personnel arrived a minute or two after the residence was secured, and when the victim was rolled over, a closed pocketknife was found under his body.

Agent Bradley Everett with the TBI Crime Laboratory testified that he performed DNA testing on the defendant's clothing and shoes, an axe, and pocketknife, as well as examined the articles for the presence of blood. The defendant's blood was found on his shirt and tee shirt. Blood from two different people was found on the inside pocket of the defendant's pants. The victim was the major contributor of the DNA profile, and the defendant could not be excluded as a possible minor contributor to that profile. A sample from the back of the defendant's pants also matched the victim. The victim's blood was found on the defendant's boots and the axe.

Agent Elizabeth Reed with the TBI testified as a latent print expert that she examined the pocketknife recovered from underneath the victim's body and on it discovered a latent palm print matching the defendant.

**Defendant's Proof**

Christopher Sajobise testified that one time in June 2006, he went with the defendant to the defendant's house after the two had been visiting with another friend. When they arrived, the victim was at the defendant's house with his young son. Sajobise recalled that the boy started to play with a box fan against the victim's direction. The victim "grabbed [his son] by his arm and jerked him up in the air and started whipping him." The defendant "jumped up and got in the middle of him [sic], separated. He sat the boy down. And they just went nose-to-nose, arguing."

Sajobise recalled that when the defendant and the victim started arguing, April Norman ran out of the residence saying she was going to call the police. Sajobise got up and separated the two men but then saw that the victim had his knife out. Sajobise punched the victim in the face and grabbed his wrist, receiving a cut on his left hand in the process. Sajobise continued to punch the victim, and the struggle went toward the couch. The victim was in a position bent backwards over the arm of the couch with Sajobise over the top of him. Sajobise explained, "[U]pon me falling off the couch, I received another cut [o]n my forehead." Sajobise admitted that the defendant took the victim's side of the story and that there was a warrant for his arrest for assault and battery by the time he finished receiving treatment at the hospital as a result of this incident. On cross-examination, Sajobise admitted that he had been involved in several incidents of violence in the past.

The defendant testified that on January 10, 2007, his ex-wife, Westmoreland, had been living with him for two months and "[they] had just got back together. [He] thought [they] w[ere] getting [their] lives back together." That evening around 4:30 p.m., April Norman arrived at his house because she wanted him and Westmoreland to babysit her youngest child while she went to Wal-Mart "to get some Lortabs." Norman, the victim, and their other child returned around 6:30 p.m. with "[a] 12 pack of beer, a pint of Vodka and the Lortabs."

The defendant testified that each of the four adults drank three beers out of the twelve-pack. The defendant and Westmoreland "drank a fourth of [the pint of vodka]," and Norman and the victim drank some of it as well. He and Westmoreland also took some Lortab pills, but he did not see Norman or the victim take any. Around 9:00 p.m., the victim and Norman went to the liquor store and returned with another pint of vodka, but the defendant did not drink any of that vodka and only saw Westmoreland take "one little drink."

The defendant testified that around 11:00 p.m., he left his bedroom, where Westmoreland and Norman remained, and walked into the kitchen. The victim was coming out of the kitchen as he was walking in. When the defendant returned to his bedroom, he saw Westmoreland on the floor, and "[the victim] had [Westmoreland] by the hair of the head, on his knees." The victim "was beating her head against the floor." The defendant elaborated that "[the victim] beat [Westmoreland's] head against the floor, twice. When he come the third time, he still had his left hand with her hair, and was bringing his right hand back to his pocket."

The defendant testified that he could not see the victim's right hand, but he thought the victim was reaching to his pocket to get his knife to kill Westmoreland. He said that the victim had his knife out earlier that evening, "flicking it. He flicked it all the time." The defendant noted that the victim put his knife away in his right pocket and that he usually opened his knife up with one hand. Asked why he thought the victim was going to kill Westmoreland, the defendant responded, "[I]t's just -- [the victim], when he gets drinking, he's knife happy. He's dangerous."

The defendant testified that when he saw the victim go toward his pocket, he "grabbed the axe" that was leaning against the entertainment center in his bedroom. He explained that there was an axe in his bedroom because Westmoreland brought it in to split wood and because she wanted "to keep the children from getting it outside." The defendant stated that he picked up the axe with one hand and swung it at the victim. The defendant said that he did not physically attack the victim instead because "[he] couldn't handle [the victim]." He explained that they "had several fights before where [he] got the severe end

of it." He elaborated that:

> One time, he beat me, under the trailer. I had to get up under the trailer to keep him off of me. And another time, we got into it in the kitchen, and he got me down, and my son hit him in the head with a lamp and knocked him out, and April took him to the hospital.

With regard to the altercation to which Sajobise testified, the defendant stated that the incident happened as Sajobise said, not the way he had told the police making Sajobise sound like the aggressor. The defendant said that the incident with Sajobise was the only time he had seen the victim pull his knife on someone.

The defendant testified with regard to the statement he gave after the incident in this case that he was not able to read it before he signed it because he did not have his eyeglasses. He said that he signed it because he "thought it was what [he] had said," but upon later reading it, he realized it was not what he had said. He stated that he would not have signed a statement identifying the victim as his son-in-law or his daughter by the last name of Fuller or containing an incorrect recollection of the events. On cross-examination, the defendant said that he did not say anything to Detective Martin about the victim reaching back like he was going for his knife to kill Westmoreland because Detective Martin did not ask about a knife.

William McDonald, a friend of the victim, testified that the victim carried a knife with him "[e]very single day" and would flip it out and sharpen it often.

After the conclusion of the proof, the jury convicted the defendant of the lesser-included offense of second degree murder.

**Motion for New Trial**

The defendant filed a motion for new trial and amended motion alleging, among other things, ineffective assistance of counsel claims regarding the failure to call witnesses, failure to properly impeach witnesses, and the failure to fully develop the prior violent history of the victim. At the hearing on the motion, Tracy Roberson, the defendant's sister, testified that she went to the defendant's house on the night of the incident because her mother called to inform her that something had happened.

The police were still at the scene conducting the investigation when Roberson arrived, and Roberson spoke with Westmoreland who was sitting in the backseat of a patrol car. In an offer of proof, Roberson testified that Westmoreland told her the following

information:

> [Westmoreland] just said that they were in there, her and [Norman] had gotten into a fight. [Norman] walked in. [Norman] and [Westmoreland] got into a fight in the room where the accident occurred. They had gotten into a fight and [Norman] walked by and said, "I think I'm going to whip your ass." . . . Talking to [Westmoreland]. And [Westmoreland] said, "Do what you have got to do." At that point [Norman] called her a few other words and [Westmoreland] was sitting, she told me that she was sitting on the floor, [Norman] come over, was going to hit her. [Westmoreland] said she kicked her she thought in the chest but kicked her in the nose. Then [Norman] was holding her nose and then [the victim] came over to her. He went over to [Norman] first said, "What happened, what happened, what happened[?]" And then about that time he went running over -- she said, "He come running over to me and I was still sitting down and he grabbed my hair and said you started this f'ing s-h-i-t, you started this f'ing, you b-i-t-c-h, like this." She said he was doing like this. She was showing that motion to me. . . . [Grabbing the] [t]op of [her] head [and jerking it back and forth]. . . . [Westmoreland] said [the victim] still had a hold of the top of her head, . . . and she was doing this motion and she said the next thing she knew [the victim] was on the floor.

Roberson testified that she met with the defendant's trial counsel shortly after the incident and told him what Westmoreland had told her. Roberson said that Westmoreland told her "many times" that she had been physically accosted by the victim that night, and Roberson tried to make sure counsel was aware of any of those subsequent conversations. Roberson stated that she was present at the courthouse during the defendant's trial but was not put on the stand to testify about her conversations with Westmoreland even though she was willing and able to testify. She said that counsel ultimately decided to not have her testify because he thought it would be harder for Westmoreland to lie on the stand with Roberson "sitting on the front row so that she would have to have eye contact with [her]."

Roberson testified that she had additional conversations with Westmoreland between the time of trial and the sentencing hearing. In another offer of proof, Roberson stated that Westmoreland told her that "she would make it right" at the sentencing hearing and "tell the truth" that "[the victim] did have a hold of her and that she had every right to be fearful[.]" Roberson said that she made this additional information known to counsel and was willing to testify regarding her conversation with Westmoreland. She said that she testified at the sentencing hearing but was not asked any questions regarding Westmoreland's statements.

-11-

Roberson testified that she had never heard the defendant refer to the victim as his son-in-law, and she thought it would be "very unusual" for him to have done so. Likewise, she had never heard him refer to his daughter by the last name of Fuller. Roberson said that she spoke with counsel about those inconsistencies, but counsel did not have her testify about those issues.

On cross-examination, Roberson admitted that she did not tell any of the police officers at the scene about what Westmoreland had told her about the incident. She said that she met with Detective Martin a day or two after the incident, but she did not recall whether she told him about Westmoreland's statements. On redirect examination, Roberson stated that she had no reason to believe that Westmoreland had told the police a different version of events than what she had told her.

Cody Norman,[2] the defendant's son, testified that he arrived at the scene approximately five or ten minutes after the police. In an offer of proof, Cody testified that while Westmoreland was sitting in the back of the patrol car, she told him that "[the victim] was on top of her and that [the defendant] got him off[.]" Cody elaborated that Westmoreland said "that [the defendant] had walked in and [the victim] was on top of [Westmoreland], had her by the hair of the head, that he had her by the hair of the head." Cody said that he told counsel about Westmoreland's statement and would have been willing to testify in that regard. He did not remember having a discussion with counsel concerning whether he would testify. Cody stated that in addition to the initial time, Westmoreland "tells [him] and [his] whole family what really happened every time she is around [them]."

The defendant testified that he and counsel were aware of Westmoreland's inconsistent statements prior to trial and discussed how to use that information. The defendant said, "[W]e all knew [Westmoreland] was lying . . . . Me and [counsel] discussed it and I thought that he was going to bring that out in court." The defendant said that counsel told him that he intended to bring out the inconsistencies at trial and never told him why he did not.

The defendant testified that he did not get the opportunity to fully testify to the victim's violent history or reputation for violence at trial. For instance, the defendant was aware of an incident where the victim "pulled a knife" on Gary Gibson and another where "he pulled a knife on the boy out there at the front porch." He said that the victim had also "pulled a knife" on Tracy Roberson at one time as well as "knocked [his] mother down and broke her hip." The defendant said that the victim was known for having a knife and for

_____

[2] We will refer to this witness by his first name to prevent any confusion with his sister, April Norman, who testified at trial but not at the motion for new trial hearing.

fighting, particularly when he had been drinking or taking drugs. The defendant testified that he expected to be asked questions about the victim's prior violent history and "[s]ome [he] was, some [he] wasn't."

Norman Dugger testified to a prior incident that happened between him and the victim. Dugger stated that he went to the defendant's home one evening in 2005 and confronted the victim about having "kidnapp[ed] [his] wife and robb[ed] [his] family" in 1989. Dugger said that "[o]ne thing led to another, [and] [the victim] got up and pulled a knife on [him]." The defendant intervened and Dugger left. On cross-examination, Dugger testified that the kidnapping took place when the victim was a juvenile.

The State called counsel who testified that at the time of trial, approximately one-third of his practice was devoted to criminal work. Counsel said that "[he] met with [the defendant] and/or Ms. Roberson, who [wa]s a source of information for [him], several times a month[,]" and every day the week or two before trial. Counsel testified that Roberson came to him regarding Westmoreland's inconsistent statements, and he met with her and Cody.

Counsel testified that he made the strategic decision to use Roberson as rebuttal, but Westmoreland testified that the victim "was on top of her, yelling and screaming at her[, so] there was no inconsistent statement from Cody and [Roberson] to impeach her on." Counsel said that he had no recollection of, or memorialization in his notes, Roberson telling him that Westmoreland had said the victim had a hold of her hair. He said that "[i]f there had been a part of the hair, [he] would have put [Roberson] on [the stand]." Counsel stated that he told the defendant after Westmoreland's testimony "that went about as good for us as it could because she testified he was on top of her. That is consistent with Cody and [Roberson], so I don't think I will be using them." Counsel said that he relayed that information to Cody and Roberson during a break. Counsel testified that he was going to call Norman Dugger to testify at trial, and Dugger was in court at counsel's request. However, "the Judge's ruling at the time was that the only testimony that could come through was what [the defendant] was a party to."

On cross-examination, counsel testified that he understood the trial court's ruling regarding testimony concerning prior violent acts of the victim to mean that the testimony was limited to acts the defendant himself personally observed. Counsel acknowledged that at trial, the defendant was not asked about prior instances when the victim pulled a knife on people. However, he explained that the defendant was not asked those questions because of his understanding of the trial court's ruling and "there would [have] been a hearsay objection about had you heard about that incident." Counsel said that information of the victim's prior violent incidents would have been important at trial because it would have had

a bearing on the defendant's state of mind.

Asked why he did not make an offer of proof as to what Norman Dugger's testimony would have been if allowed to testify, counsel said, "During our out-of-court, I explained to the Court and I got on the record what the testimony would have been, I thought that was sufficient to preserve the record of what the testimony would be." Counsel recalled that Roberson told him after the trial that at the sentencing hearing, Westmoreland "was going to recant her statement [and] that she was going to testify that [the victim] was hurting her." He said that the first time he heard of Westmoreland saying that the victim was actually hurting and assaulting her was after the trial.

The recording from the preliminary hearing was made an exhibit to the motion for new trial hearing. At the preliminary hearing, Westmoreland testified that she and her daughter, April Norman, got into a fight and the women had each other by the hair of the head, neither wanting to release the other. The defendant called for the victim to pull the women apart, but Westmoreland kicked Norman off of her "a pretty good little ways." The next thing Westmoreland knew, the victim was on the floor, bleeding, and she saw the defendant standing with an axe. She said that the victim was checking on Norman when he was hit. She testified that the victim screamed at her, but she denied that he injured or touched her.

## ANALYSIS

### I. Ineffective Assistance of Counsel

The defendant argues that he received the ineffective assistance of counsel due to counsel's failure to call Tracy Roberson and Cody Norman to impeach Gwendolyn Westmoreland's testimony and failure to present evidence of the victim's history of violence through the defendant's testimony. To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance

-14-

prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997). Finally, a person charged with a criminal offense is not entitled to perfect representation. See Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). As explained in State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999), "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another."

## A. Failure to Impeach and Call Witnesses

The defendant argues that counsel failed to adequately impeach Westmoreland's testimony by having Tracy Roberson and Cody Norman testify concerning her prior inconsistent statements.

As stated above, Westmoreland testified at the preliminary hearing that the victim was checking on Norman when he was hit with the axe. At trial, she testified consistently, saying that the fight between her and Norman was over, and the victim was checking on Norman when he was hit. She said that the victim screamed at her but denied that he touched her in any way. On cross-examination, Westmoreland admitted that the victim not only screamed at her, but he stood over her and crouched down as he screamed at her. However, Westmoreland continued to deny that the victim touched or grabbed her.

-15-

At the motion for new trial hearing, Roberson testified that when she saw Westmoreland at the scene shortly after the incident, Westmoreland recalled that events of her and Norman's fight and said that the victim went to check on Norman first. Roberson further recalled that Westmoreland told her that the victim then went toward her, yelling at her that she had started the fight, and grabbed her hair and jerked her head back and forth. At the motion for new trial hearing, Cody Norman testified that Westmoreland said that the victim was on top of her, holding her by the hair of the head, when the defendant hit him. With regard to these witnesses, counsel testified at the motion for new trial hearing that he did not call them because Westmoreland did not testify contrarily to what Roberson and Cody would have testified. However, the defendant now counters that counsel mis-remembered Westmoreland's testimony because it was in fact contrary.

The defendant testified at trial that the victim had Westmoreland "by the hair of the head . . . [and] was beating her head against the floor." At the motion for new trial hearing, Tracy Roberson and Cody Norman testified that Westmoreland told them that the victim screamed over her as he held her by the hair and jerked her head back and forth. Counsel testified at the motion for new trial hearing that he had no recollection of, or memorialization in his notes, Roberson telling him that Westmoreland had said the victim had a hold of her hair, or he would have had her testify. The trial court implicitly made a credibility determination in favor of counsel in denying the defendant's motion. Although the timing of the victim's actions was not clear, Westmoreland admitted on cross-examination at trial that the victim was standing, crouched over her as he screamed at her. To that extent, there was arguably no inconsistency to impeach. As such, the defendant has failed to prove *by clear and convincing evidence* that counsel was ineffective in not having Roberson and/or Cody Norman testify.

## B. Defendant's Testimony

During a break in trial, the State, noting that it anticipated the defendant calling Sajobise and Dugger to testify, made a motion that evidence of prior acts of violence of the victim against third parties could only come in through the defendant's testimony. The State noted that the events concerning Sajobise and Dugger constituted "threats arousing against third persons[,]" which "are admissible only through the defendant's own testimony." Counsel explained that the event involving Sajobise was actually an altercation between the defendant and the victim that Sajobise "got in the middle of, and ended up getting sliced up." The trial court ruled that "evidence . . . about Mr. Sajobise getting cut" could be admitted but that, otherwise, "violent acts against third persons would have to come from [the defendant's] own testimony."

The defendant argues that counsel failed to introduce, through his testimony, the prior violent history of the victim. He asserts that he was aware of other violent acts of the victim, as well as the victim's reputation for violence, but was not asked about those matters because counsel misapprehended the trial court's ruling regarding prior acts of violence by the victim.

Initially, the record shows that the defendant was given a clear opportunity in his testimony to mention the incident between the victim and Norman Dugger as well as any other instances where he saw the victim wield a knife, yet he failed to do so. At trial, after the defendant acknowledged and affirmed Sajobise's testimony, counsel asked the defendant, "Have you ever seen [the victim] pull his knife out on anybody else, any altercations?" The defendant responded, "Just that time."

Moreover, the defendant has failed to prove, by clear and convincing evidence, that any deficiency in counsel's presentation of the victim's history of violence prejudiced his case. Christopher Sajobise testified at trial concerning an episode when the defendant and the victim went "nose- to-nose" in a heated argument, and Sajobise intervened and was cut by the victim in the process. In addition, the defendant testified that he "got the severe end" of previous fights with the victim and when asked for examples, he recalled an incident where "[the victim] beat [him], under the trailer" and another that ended with the defendant's son hitting the victim in the head with a lamp. The defendant described the victim as "knife happy" and "dangerous" when he drank. Because the victim's violent tendencies were clearly brought to the jury's attention, the defendant has failed to prove prejudice.

## II. Thirteenth Juror

The defendant argues that the trial court failed in its responsibility as the thirteenth juror. Rule 33(d) of the Tennessee Rules of Criminal Procedure provides that a "trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." The rule imposes a mandatory duty on the trial judge to act as the thirteenth juror in every criminal case. See State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995). The trial court does not have to make an explicit statement on the record. Instead, this court may presume the trial court approved of the jury's verdict when the trial court overrules the motion for new trial. See State v. Moats, 906 S.W.2d 431, 434 (Tenn. 1995). However, if "the record contains statements by the trial judge expressing dissatisfaction or disagreement with the weight of the evidence or the jury's verdict, or statements indicating that the trial court absolved itself of its responsibility to act as the thirteenth juror[,]" the reviewing court may reverse the trial court's judgment. Carter, 896 S.W.2d at 122.

In ruling on the motion for new trial, the trial court stated:

Of course, you know, second degree murder and voluntary manslaughter are very close in definition. In this case when you mix Lortab . . . and whiskey and Vodka and people with a propensity to violence, these people had been drinking and using drugs, drinking and abusing drugs the biggest part of their li[ves], and it just all came tumbling down that day in that trailer when [the victim] was killed by a blow to the head with an axe. The jury sorted it out and decided that the second degree murder verdict should be it and that's what they did.

I am going to overrule your motion.

The defendant argues that the trial court's statement regarding the closeness of second degree murder and voluntary manslaughter, paired with the trial court's statement at the sentencing hearing that had an axe not been close by there likely would have been nothing more than a fight, indicates that the trial court had some dissatisfaction with the verdict. He further argues that the trial court's statement that the jury sorted it all out and decided what the verdict should be showed that the trial court absolved itself of the responsibility of acting as the thirteenth juror.

We disagree. We do not read the trial court's statements as an indication that it was dissatisfied with the verdict or absolving itself of the responsibility to act as the thirteenth juror. The trial court was merely acknowledging the role of the jury and the close definitions of the two offenses in light of the defendant's argument that his offense constituted voluntary manslaughter. The defendant is not entitled to relief.

### III. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to sustain his conviction. He argues that there was no proof that he "realized that his action of swinging the axe at the [victim] was reasonably certain to cause the death of the [victim]." In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All

questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Second degree murder is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (2006). The fact that the defendant swung an axe at the victim, hitting him in the head and causing his death is not in controversy. The question is whether the defendant was aware that his conduct was reasonably certain to cause the result. The defendant testified that he hit the victim because he was afraid that the victim "was fixin' to kill [Westmoreland]," and he chose not to merely physically attack the victim because he "couldn't handle [the victim]." In the light most favorable to the State, having heard that the defendant consciously chose to use a "weapon" to respond to what he perceived to be a deadly threat, the jury could reasonably conclude that the defendant was aware that striking the victim in the head with an axe was reasonably certain to cause the victim's death.

## IV. Sentencing

The defendant argues that the trial court erred in applying an enhancement factor to his sentence and failing to find any mitigating factors.

Second degree murder is a Class A felony. Tenn. Code Ann. § 39-13-210(c). For a Range I offender convicted of a Class A felony, the range of punishment is fifteen to twenty-five years. Id. § 40-35-112(a)(1). The State filed a notice of intent to seek enhanced

punishment, claiming that "[t]he defendant treated, or allowed [the] victim to be treated, with exceptional cruelty during the commission of the offense[.]" Id. § 40-35-114(5) (2006). The defendant filed a notice of mitigating factors, arguing that he acted under strong provocation, id. § 40-35-113(2); substantial grounds exist tending to excuse or justify his criminal conduct, though failing to establish a defense, id. § 40-35-113(3); he assisted the authorities in locating or recovering any property or person involved in the crime, id. § 40-35-113(10); although guilty of the crime, he committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct, id. § 40-35-113(11); and any other factor consistent with the purposes of the statute, id. § 40-35-113(13).

The trial court conducted a sentencing hearing, at which it heard testimony from the victim's father; the defendant's sister; the defendant's mother; the defendant's ex-wife, Gwendolyn Westmoreland; and the defendant.[3] Prior to announcing the defendant's sentence, the trial court stated:

> What we have here is . . . a lethal combination . . . two pints of Vodka and two pints of whiskey, evidently some cocaine because [the victim] was positive for presence of cocaine, a sack of Lortab, as I recall a 12-pack of beer and an axe. And you add to this mixture, a group of people that, by their own admission, have a propensity to violence, especially when they're using drugs and consuming alcohol. So it really ought not to be any surprise to anyone that somebody got hurt or somebody got killed in that mixture.
>
> In my opinion, and it[] essentially still is, just given the fact that [the victim] and Ms. Westmoreland were fighting, which I don't think that there's any question that they were, but I don't think it was necessary to use this axe in order to break that up.
>
> Quite frankly, had the axe not been in the room we'd probably had a great big fight here and a bunch of people hung-over the next morning, and the whole matter would have gone unnoticed. But I say, you blame most of this on the mixture that was there, Lortab, whiskey, Vodka, beer, cocaine, violence and an axe. So I guess it was almost inevitable that something would happen.
>
> I've considered the mitigating factors that have been mentioned in this case and also the enhancing factors. So if you'll come around, [counsel], with

---

[3] A presentence report was prepared and made an exhibit at the hearing but was not included in the record on appeal.

[the defendant].

. . . .

. . . This is case Number 16988, State of Tennessee versus [the defendant]. [The defendant], on August the 2nd, 2007, a jury of your peers found you guilty of second-degree murder. It will therefore be the judgment of this Court, pursuant to that jury verdict, that you be found guilty of second-degree murder. Punishment imposed shall be a sentence of 20 years with the Tennessee Department of Correction[]. . . .

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2006). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses, (h) any statements made by the accused in his own behalf, and (i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

In imposing a specific sentence within a range, a trial court "shall consider, but is not bound by" certain advisory sentencing guidelines, including that the "minimum sentence

within the range of punishment is the sentence that should be imposed" and that "[t]he sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors[.]" Tenn. Code Ann. § 40-35-210(c)(1), (2). The weighing of the various mitigating and enhancement factors is "left to the trial court's sound discretion." State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008).

The "exceptional cruelty" enhancement factor is usually found in cases of abuse or torture. See State v. Williams, 920 S.W.2d 247, 250 (Tenn. Crim. App. 1995). The facts supporting a finding of "exceptional cruelty" must "'demonstrate[] a culpability distinct from and appreciably greater than that incident to' the crime." State v. Poole, 945 S.W.2d 93, 98 (Tenn. 1997) (quoting State v. Jones, 883 S.W.2d 597, 601 (Tenn. 1994)). In this case, the trial court found the "exceptional cruelty" factor to be applicable but provided no reasoning for this finding. Without insight from the trial court, the only apparent basis we are able to discern for this finding is the defendant's use of an axe – not a commonly used weapon. In a case where the suspected weapon was a screwdriver, this court found that "multiple stab wounds," standing alone, was insufficient to support the "exceptional cruelty" factor. See State v. Leslie Brian Willis, No. M2001-00634-CCA-R3-CD, 2003 WL 21523250, at *29-30 (Tenn. Crim. App. June 30, 2003), perm. to appeal denied (Tenn. Jan. 26, 2004).

Here, the evidence showed the defendant took only one swing at the victim, and the victim fell to the ground instantly. There is no evidence that the defendant did anything else to the victim either before or after the blow. Although the use of an axe as a weapon is an unpleasant thought, there was simply no proof that the defendant treated the victim with exceptional cruelty. Accordingly, due to the trial court's misapplication of one enhancement factor and the presence of no other enhancement factors, the defendant must be sentenced to the minimum sentence in the range of fifteen years.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the defendant's conviction but modify his sentence to fifteen years.

_____
ALAN E. GLENN, JUDGE